UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS,

                Plaintiff,

    v.

UAVE LLC,

                Defendant.

Case No.

**COMPLAINT**

## INTRODUCTION

1.      Defendant UAVE LLC ("UAVE") operates a sand and gravel mining and processing facility at 973 University Ave in Norwood, Massachusetts (the "Facility"). The Facility is operated on approximately 15 acres of mostly deforested land on a steep slope covered by exposed sediment such as sand and gravel.

2.      UAVE discharges polluted stormwater from its Facility into a wetland system connected to Purgatory Brook ("Purgatory Brook Wetlands"). Purgatory Brook is a tributary of the Neponset River. UAVE never applied for and never received a federal industrial stormwater discharge permit for these discharges, as is required by the federal Clean Water Act. 33 U.S.C. § 1251 et seq. (the "Clean Water Act" or "the Act"). UAVE.does not properly monitor or control its stormwater discharges, as is required by the Act.

3.      Wetlands play an essential role in the ecology and hydrology of watersheds. Among other things, wetlands provide habitat for important species, protect downstream water quality, and prevent flooding. UAVE's stormwater contains pollutants including sediment, the

most significant cause of water quality degradation in the Nation's waters. Excessive sediment

discharged to wetlands destroys habitat, harms aquatic organisms, and can contribute to flooding.

4.      UAVE's discharges of stormwater to the Purgatory Brook Wetlands are in violation

of the Clean Water Act. The Commonwealth of Massachusetts (the "Commonwealth") brings this

civil suit to enforce the requirements of the Act. The Commonwealth seeks injunctive relief, civil

penalties, and other relief the Court deems appropriate to redress UAVE's illegal discharges of

pollution.

**JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction over the parties and the subject matter of

this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C.

§ 1331 (an action arising under the laws of the United States).

6.      On February 19, 2020, the Commonwealth provided notice of UAVE's violations

of the Clean Water Act, and of its intention to file suit against UAVE (the "Notice Letter"), to the

Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator

of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental

Protection ("MassDEP"); and to UAVE, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

7.      More than sixty days have passed since notice was served.

8.      This action is not barred by any prior state or federal enforcement action addressing

the violations alleged in this complaint.

9.      The Commonwealth has an interest in protecting for its residents the integrity of

Massachusetts waters, and the related health, safety, economic, recreational, aesthetic, and

environmental benefits those waters provide. The interests of the Commonwealth have been, are

being, and will continue to be adversely affected by UAVE's failure to comply with environmental

laws, as alleged in this Complaint. The requested relief will redress the harms to the

Commonwealth caused by UAVE's activities. UAVE's continuing commission of the acts and

omissions alleged in this Complaint will irreparably harm the Commonwealth, for which harm it

has no plain, speedy, or adequate remedy at law.

10.    Venue is proper in this Court pursuant to Section 505(c)(1) of the Act, 33 U.S.C.

§ 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

11.    Plaintiff is the Commonwealth, appearing by and through the Attorney General.

12.    The Attorney General is the chief law officer of the Commonwealth, with offices at

One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the

requested relief under G.L. c. 12, §§ 3 and 11D.

13.    Defendant UAVE is a domestic limited liability corporation that operates a mineral

mining and dressing facility at 973 University Ave, Norwood, Massachusetts and lists its location

where records are maintained as 1039 East Street, Dedham, Massachusetts.

## STATUTORY BACKGROUND

### Federal Clean Water Act Requirements

*Prohibition on Unauthorized Discharges of Pollutants*

14.    The Clean Water Act makes the discharge of pollution into waters of the United

States unlawful unless the discharge is in compliance with certain statutory requirements, including

the requirement that the discharge be permitted by EPA under the National Pollutant Discharge

Elimination System ("NPDES"). *See* Sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C.

§§ 1311(a), 1342(a), 1342(p).

15.     Industrial stormwater is runoff from precipitation (rain or snow) that lands on industrial sites such as mineral mining and dressing facilities. This runoff is often polluted by materials that are handled or stored at such sites.

16.     Stormwater is the leading cause of water quality impairment in Massachusetts. During every rain or snowmelt event, runoff flows over the land surface, picking up potential pollutants such as sediment, nutrients, metals and petroleum by-products. Polluted stormwater runoff can be harmful to plants, animals, and people. Excess sediment clouds the water, makes it difficult or impossible for aquatic plants to grow, and destroys aquatic habitats. Excess nutrients cause algae blooms that reduce dissolved oxygen in the water column, harming fish and other aquatic organisms. Bacteria and other pathogens can wash into swimming areas and create health hazards. Toxic pollutants can poison aquatic life. Land animals and people can become sick from eating diseased fish or ingesting polluted water.

17.     Impacts from stormwater pollution, including sediment and other pollutants, pose particular risks to wetlands. Wetlands are among the most productive ecosystems in the world, comparable to rain forests and coral reefs. Wetlands play an integral role in the ecology and hydrology of the watershed. The combination of shallow water, high levels of nutrients, and high primary productivity is ideal for the growth of organisms that form the base of the food web and feed many species of fish, amphibians, shellfish, and insects. Many species of birds and mammals rely on wetlands for food, water, and shelter, especially during migration and breeding. The holding capacity of wetlands also prevents floods and erosion. Wetlands function as natural sponges that trap and slowly release surface water, rain, snowmelt, groundwater, and flood waters. Trees, root mats, and other wetland vegetation also slow the speed of flood waters and distribute them more slowly over the floodplain. Wetlands store carbon within their plant communities and

soil instead of releasing it to the atmosphere as carbon dioxide. Thus, wetlands help to moderate

global climate conditions. Stormwater contaminated with sediment can harm wetlands by, among

other things, suffocating the native species and allowing noxious and invasive species to come in

and dominate the area. Sedimentation can also decrease wetland volume, decrease the duration that

wetlands retain water, and change plant community structure. This can severely harm vegetation,

soils, and downstream water quality and significantly increase the risk of flooding.

18.     To minimize polluted stormwater discharges from industrial facilities, EPA has

issued a general industrial stormwater permit ("Stormwater Permit") under the NPDES program.

EPA first issued the Stormwater Permit in 1995 and reissued the permit in 2000, 2008, and 2015.

*See* 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572

(Sept. 29, 2008); 80 Fed. Reg. 34403 (June 4, 2015).

19.     Mineral mining and dressing facilities are subject to the requirements of the

Stormwater Permit. Stormwater Permit, Appendix D, pg. D-3. Therefore, mineral mining and

dressing facilities must obtain coverage under the Stormwater Permit and stormwater discharges

without such permit coverage are unlawful. *See* Sections 301(a), 402(a) and 402(p) of the Act, 33

U.S.C. §§ 1311(a), 1342(a), 1342(p).

20.     The Stormwater Permit requires these facilities to, among other things:

a.     prepare a stormwater pollution prevention plan ("SWPPP") that, among

other things, describes the facility and identifies all stormwater outfalls,

Stormwater Permit, pg. 31;

b.     submit to EPA a "Notice of Intent" to be covered by the Stormwater Permit

that lists all stormwater outfalls by a unique 3-digit code and corresponding

latitude and longitude coordinates, Stormwater Permit, Appendix G;

c.      ensure that pollutant control measures minimize pollutants in stormwater

discharges, Stormwater Permit, pg. 14;

d.      locate materials, equipment, and activities to contain potential spills,

Stormwater Permit, pg. 15;

e.      minimize erosion by stabilizing exposed soils at the facility and use

structural and non-structural control measures to minimize the discharge of

sediment, Stormwater Permit, pg. 17;

f.      evaluate for and eliminate unauthorized non-stormwater discharges,

Stormwater Permit, pg. 19;

g.      ensure that stormwater discharges do not cause or have the reasonable

potential to cause or contribute to a violation of water quality standards,

Stormwater Permit, pg. 20;

h.      implement specific best management practices applicable to mineral mining

and dressing facilities, Stormwater Permit, pgs. 105-109;

i.      monitor stormwater discharges from all outfalls for compliance with

benchmarks applicable to mineral mining and dressing facilities,

Stormwater Permit, pg. 113;

j.      report all monitoring results for all facility outfalls to EPA by specified

deadlines, Stormwater Permit, pgs. 48-49;

k.      conduct corrective action to expeditiously eliminate excessive stormwater

pollution and unauthorized non-stormwater discharges, Stormwater Permit,

pgs. 27-29;

l.      conduct routine facility inspections at least quarterly (Stormwater Permit,

pg. 22) and quarterly visual assessments (Stormwater Permit, pg. 24) to,

among other things, sample and assess the quality of the facility's

stormwater discharges, ensure that stormwater control measures required by

the permit are functioning correctly and are adequate to minimize pollutant

discharge, and timely perform corrective actions when they are not,

Stormwater Permit, pgs. 22-26;

m.      timely prepare and submit to EPA annual reports that include findings from

the facility inspections and visual assessments and the documentation of

corrective actions, Stormwater Permit, pgs. 49-50; and

n.      comply with any additional Massachusetts requirements, including but not

limited to the requirements of the Massachusetts Clean Waters Act its

implementing regulations. Stormwater Permit, pg. 170.

*Citizen Suit Provision of the Federal Clean Water Act*

21.      Section 505(a)(1) of the Act authorizes citizen enforcement actions against any

"person," including individuals, corporations, or partnerships, for violations of NPDES permit

requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f),

§ 1362(5).

22.      The Commonwealth is a "citizen" within the meaning of Section 505 of the Act,

because it is a "person" having an interest which is or may be adversely affected. *See* Section

505(g); 33 U.S.C. § 1365(g).

23.      Under Section 505 of the Act, this Court has authority to enjoin UAVE's violations

of the Act's prohibition on unauthorized discharges of pollutants and to require the company to

comply with its Stormwater Permit. The Court also has authority to impose penalties of up to

$54,833 per day for each of the company's prior violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40

C.F.R. § 19.4; 84 Fed. Reg. 2058 (Feb. 5, 2019).[1]

## STATEMENT OF FACTS

### Description of the UAVE Facility & Activities

24.     UAVE mines and processes sand and gravel on approximately 15 acres of mostly

deforested land covered by exposed sediment such as silt, sand, and gravel ("Surface Sediment") at

the Facility. As such, UAVE is a mineral mining and dressing facility, as specified under Sector J

in Table D-1 of Appendix D of the Stormwater Permit.

25.     UAVE stores raw material and finished material ("Industrial Material") in outdoor

piles located at various locations at the Facility.

26.     UAVE moves Industrial Material around the Facility using trucks, tractors, and

other heavy equipment ("Equipment").

27.     UAVE's Industrial Material is sediment-laden.

28.     Surface Sediment, Industrial Material, and pollutants that are present in or adhere to

Surface Sediment and Industrial Material (collectively, "Pollutants") become mobilized by

Equipment at the Facility and are tracked around and off the Facility by Equipment.

---

[1] The statutory maximum civil penalty for violations that occurred on or before November 2, 2015 is $37,500 per day, per violation. 40 CFR § 19.4, Table 1.

**UAVE's Discharge of Pollutants from the Facility**

*Polluted Industrial Stormwater Discharges to
the Purgatory Brook Wetlands*

29.     Industrial Material and Surface Sediment at the Facility are exposed to precipitation.

30.     Pollutants become mobilized by stormwater.

31.     The Facility slopes steeply to the southwest, dropping more than 100 feet in elevation from its northeastern edge to the bottom of its driveway on University Avenue.

32.     The following screenshot taken from Google Maps Street View (image captured November 2017) and annotated by the Attorney General's Office shows the direction of flow of UAVE's polluted stormwater as it enters catch basins near University Avenue ("Driveway Catch Basins").



33.     The Driveway Catch Basins are linked to a drainage channel that leads to the Purgatory Brook Wetlands.

34.     UAVE discharges stormwater containing Pollutants from the Facility and into the Driveway Catch Basins.

35.     Stormwater from the Facility that is discharged to the Driveway Catch Basins flows to the Purgatory Brook Wetlands.

36.     Pollutants that are tracked off of the Facility onto University Avenue by Equipment are picked up in stormwater and discharged into the Purgatory Brook wetlands via catch basins on University Avenue.

37.     The Purgatory Brook Wetlands flow to Purgatory Brook. The Commonwealth has designated Purgatory Brook as a Coldwater Fish Resource due to the presence of Brown Trout in the brook. The area of the Neponset River downstream of its confluence with Purgatory Brook is designated Estimated Habitat and Priority Habitat for the Blanding's Turtle and the Ringed Boghaunter (dragonfly), both of which are state-listed threatened species. The same area is designated Priority Habitat for Long's Bittercress, a state-listed endangered plant species, and Long's Bulrush, a state-listed threatened plant species. The floodplain of the Neponset River in this area is Priority Habitat for Britton's Violet and Pale Green Orchis, both of which are state-listed threatened plant species. The Commonwealth has designated the area in and around the Neponset River at this location to be "Core Habitat" critical for the long-term persistence of these and other species of conservation concern. According to the Massachusetts Department of Fish & Game, protection of Core Habitat "is essential to safeguard the diversity of species and their habitats, intact ecosystems, and resilient natural landscapes across Massachusetts."[2]

---

[2] Massachusetts Department of Fish & Game, Division of Fisheries & Wildlife and The Nature Conservancy, BioMap2: Conserving the Biodiversity of Massachusetts in a Changing World (2010).

**UAVE's Failure to Obtain a Stormwater Permit and
Non-Compliance with the Terms of the Stormwater Permit**

38.    UAVE never applied for and never obtained a Stormwater Permit.

39.    UAVE never:

    a.    prepared a SWPPP for the Facility that, among other things, includes the location of all stormwater outfalls in the SWPPP (section 5.2);

    b.    submitted a "complete and accurate NOI" for the Facility (section 1.2.1);

    c.    ensured that pollutant control measures minimize pollutants in its stormwater discharges (section 2.1);

    d.    located materials, equipment, and activities to contain potential spills (section 2.1.2.1);

    e.    minimized erosion by stabilizing exposed soils at the Facilities and used structural and non-structural control measures to minimize the discharge of sediment (section 2.1.2.5);

    f.    evaluated for the presence of and eliminated all non-stormwater discharges at each Facility (section 2.1.2.9);

    g.    ensured that stormwater discharges do not cause or contribute to a violation of water quality standards (section 2.2.1);

    h.    implemented specific best management practices applicable to mineral mining and dressing facilities (section 8.J.8);

    i.    monitored stormwater discharges from all outfalls for compliance with EPA's benchmark limits (section 6.1.1);

    j.    reported to EPA monitoring results for all outfalls (section 7.4);

11

k.    taken corrective action to eliminate non-stormwater discharges and addressed excessive pollutant discharges (section 4.1);

l.    conducted routine and quarterly facility inspections to ensure, among other things, that control measures are functioning correctly and are adequate to minimize pollutant discharges (sections 3.1 and 3.2);

m.    timely prepared and submitted to EPA annual reports that include findings from the facility inspections and visual assessments and the documentation of corrective actions (section 7.5); and

n.    complied with additional state requirements incorporated by reference into the Permit, including the Massachusetts Clean Waters Act and the Massachusetts Wetlands Protection Act (section 9.1.2.1).

## FIRST CAUSE OF ACTION

**Discharges of Industrial Stormwater Without a Federal Stormwater Permit:
Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

40.    The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

41.    UAVE is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

42.    The Purgatory Brook Wetlands are "navigable waters" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

43.    By discharging industrial stormwater from the Facility to the Purgatory Brook Wetlands without a Stormwater Permit, UAVE violated and continues to violate Section 301(a) of the Act, 33 U.S.C. § 1311(a).

44.     Each day that UAVE discharged industrial stormwater from the Facility to the

Purgatory Brook Wetlands without a Stormwater Permit is a separate and distinct violation of

Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred

and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

45.     These violations establish an ongoing pattern of failure to comply with the Act's

requirements.

**SECOND CAUSE OF ACTION**

**Noncompliance with the Federal Stormwater Permit:**
**Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

46.     The Commonwealth realleges and incorporates by reference the allegations

contained in the above paragraphs.

47.     By failing to perform the actions set forth in paragraph 20, above, UAVE has

violated and continues to violate Section 301(a) of the Act, 33 U.S.C. § 1311(a).

48.     Each of UAVE's violations of the requirement of the Stormwater Permit is a

separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on

which the violation occurred and/or continued. *See also* Section 505(a)(1) and (f), 33 U.S.C.

§§ 1365(a)(1) and (f).

49.     These violations establish an ongoing pattern of failure to comply with the Act's

requirements.

**RELIEF REQUESTED**

Wherefore, the Commonwealth respectfully requests that this Court grant the following

relief:

1.     Require UAVE to comply with EPA's federal Stormwater Permit;

2.      Order UAVE to pay civil penalties of up to: $54,833 per day for each of the

company's prior violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40 C.F.R. § 19.4; 84 Fed.

Reg. 2058 (Feb. 5, 2019).

3.      Order UAVE to take appropriate actions to restore the quality of protected resource

areas and waterways impaired by its activities;

4.      Award the Commonwealth's costs (including reasonable investigative, attorney,

witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

5.      Award any such other and further relief as this Court may deem appropriate.

Dated: August 31, 2020                      Respectfully submitted,

                                            COMMONWEALTH OF MASSACHUSETTS

                                            By its attorneys,

                                            MAURA HEALEY
                                            ATTORNEY GENERAL

                                            _____
                                            Nora J. Chorover (Bar No. 547352)
                                            Emily K. Mitchell (Bar No. 703726)
                                            Special Assistant Attorney General
                                            Environmental Protection Division
                                            Office of the Attorney General
                                            One Ashburton Place, 18th Floor
                                            Boston, Massachusetts 02108
                                            Tel: (617) 727-2200, ext. 2436
                                            Nora.Chorover@state.ma.us
                                            Emily.Mitchell@state.ma.us